JUDGE KAPLAN

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

08 CV 0431

POWER JAMB, LLC, and MICHAEL BISHOP,

Plaintiffs,

- against-

THE CITY OF NEW YORK, THE NEW YORK CITY FIRE DEPARTMENT, THE NEW YORK CITY FIRE ACADEMY, CHIEF STEPHEN GERAGHTY, CHIEF THOMAS ROBSON, CAPTAIN ROBERT HIGGINS, FIREFIGHTER ROBERT RIVERA, AND "JOHN DOE," Nos. 1-10, individually and in their official capacities as employees of the City of New York,

Defendants.

DOCKET NO.: _________

**VERIFIED COMPLAINT**

RECEIVED
JAN 17 2008
U.S.D.C. S.D. N.Y.
CASHIERS

---

Plaintiffs, by the undersigned attorneys, set forth the following as their complaint against the defendants:

**Nature of the Action**

1. This is an action seeking injunctive relief and damages for willful patent infringement of United States Patent Number 5,906,493, (the '493 patent), and common law unfair competition against the aforementioned defendants.

**Jurisdiction and Venue**

2. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 (federal question) and 28 U.S.C. §1338 (patent, trademark and copyright), and pursuant to 28 U.S.C. §1338(b), pendent jurisdiction over plaintiffs' state law claims. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §§ 1391(b) and (c)).

## The Parties

3. Plaintiff Power Jamb, LLC, ("Power Jamb"), is a New York limited liability company with its principal office located at 77 Alphonse Road, Brockton, Massachusetts. Power Jamb is the exclusive licensee of the '493 patent in the United States and has the sole and exclusive right to make, use, sell and otherwise commercialize the device covered by the '493 patent. A copy of the '493 patent is attached hereto as exhibit A.

4. Plaintiff Michael Bishop, ("Bishop"), is the inventor, sole owner and licensor of the device covered by the '493 patent and is a citizen and resident of the Commonwealth of Massachusetts.

5. Defendant City of New York, ("City"), is a municipal corporation existing under the laws of the State of New York.

6. Defendant Fire Department of the City of New York, ("FDNY"), is an agency of defendant City.

7. Defendant New York City Fire Academy, ("the Academy"), is a division of FDNY and is charged with the responsibility of training new trainees for the position of firefighter with the FDNY.

8. Defendant Chief Stephen Geraghty, ("Geraghty"), was at all relevant times, and is an employee of FDNY. Upon information and belief, Geraghty is resident of the State of New York.

9. Defendant Chief Thomas Robson, ("Robson"), was at all relevant times, and is an employee of FDNY. Upon information and belief, Robson is resident of the State of New York.

10. Defendant Captain Robert Higgins, ("Higgins"), was at all relevant times, and is an employee of FDNY. Upon information and belief, Higgins is resident of the State of

New York and at all relevant times, was the officer in charge of probationary firefighter training.

11. Defendant Robert Rivera, ("Rivera"), was at all relevant times, and is an employee of FDNY and is currently assigned to Engine 241, Ladder 109 within the FDNY. Upon information and belief, Rivera is resident of the State of New York.

**Facts Common To All Causes Of Action**

12. Plaintiffs have complied with all condition precedents required under New York's General Municipal Law, Article 50, to bring this action; to wit, by filing with the New York City's Comptroller's Office, a notice of claim on November 2, 2007.

13. Bishop is a former lieutenant with the FDNY, retiring with distinction of service in 1999 and received a "Hero of the Month" award from the FDNY in 1998.

14. On December 31, 1997, Bishop filed an application for letters patent with the United States Patent and Trademark Office for a device, ("Training Device"), used for training new firefighter trainees the proper technique for prying open locked doors.

15. Starting in or about April 1999, defendants City, FDNY and Academy started purchasing units of the Training Device from Bishop.

16. On May 25, 1999, the PTO granted Bishop the '493 patent covering the Training Device.

17. Defendants City, FDNY and Academy continued to make several purchases of the Training Device from plaintiffs until approximately 2006 when defendants started to manufacture devices (the "Accused Devices"), that copy and infringe upon the claims of the '493 patent and used these Accused Devices at the facilities of the Academy to train new trainees and to maintain the skills of defendants' firefighters.

18. Defendants' manufacture and use of the Accused Devices was and is without plaintiffs' permission and consent.

19. Defendants' acts of manufacture and use of the Accused Devices were done with full notice and knowledge of plaintiffs' exclusive patent rights and were undertaken willfully and in reckless disregard of plaintiffs' rights.

**First Cause of Action**

**(Patent Infringement)**

20. Plaintiffs repeat each allegation contained within paragraphs 1 through 19 as if more fully set forth herein.

21. Defendants' manufacture, use and distribution of the Accused Devices which implement the claims of the '493 patent constitute willful patent infringement in violation of §§ 271, 281 of the Patent Act, (Title 35 U.S.C.A.).

22. Defendants' infringement of plaintiffs' '493 patent has caused plaintiffs' to sustain substantial damages in lost sales in an amount to be determined by the Court.

**Second Cause of Action**

**(Injunctive Relief)**

23. Plaintiffs repeat each allegation contained within paragraphs 1 through 22 as if more fully set forth herein.

24. Despite notice of plaintiffs' patent rights, defendants continue to infringe and induce infringement of the '493 patent within the Southern District and elsewhere in the United States and will continue to do so unless enjoined by this Court.

25. Plaintiffs have no adequate remedy at law.

**Third Cause of Action**

**(Common Law Unfair Competition)**

26. Plaintiffs repeat each allegation contained within paragraphs 1 through 25 as if more fully set forth herein.

27. Defendants' continued manufacture, use and distribution of the Accused Devices substantially and irreparably damages the market for plaintiffs' products and because defendants' Accused Devices are paid for by the taxpayers of the City of New York and other public sources, defendants' acts of infringement constitute unfair competition under the common law.

28. On account of defendants' activities in this State, County and Southern District of New York, plaintiff has been damaged in an amount not as yet ascertained but to be determined by the Court.

**Third Cause of Action**

**(Accounting)**

29. Plaintiffs repeat each allegation contained within paragraphs 1 through 28 as if more fully set forth herein.

30. Defendants have utilized the Accused Devices to their benefit and to the detriment of plaintiffs in the form of lost sales and/or licensing fees. Such utilization of the Accused Devices has caused plaintiffs to sustain lost sales and revenues in an amount that is presently unknown, but believed to be in excess of $75,000 that would be otherwise payable to plaintiffs.

31. The exact value of the benefit received by defendants is unknown to plaintiffs and can only be determined by an accounting. Plaintiffs are informed that the value of defendants' wrongfully gained benefit is in excess of $75,000.

32. Plaintiffs have demanded an accounting by defendants of the number of Accused Devices that they have manufactured, distributed and used. Defendants have failed and refused to provide such an accounting or to pay plaintiffs any sums due.

## Fourth Cause of Action

## (Unjust Enrichment)

33. Plaintiffs repeat each allegation contained within paragraphs 1 through 32 of the complaint as if more fully set forth herein.

34. Pursuant to contractual agreements, for several years, defendants City, FDNY and Academy purchased units of the Training Device and found that the Training Device benefited defendants and its personnel. Additionally, defendants City, FDNY and Academy contracted with Power Jamb for its to service and maintain units of the Training Device as well as to furnish parts and labor.

35. As a result of the long term contractual relationship between defendants and Power Jamb, defendants learned how to service and maintain the units, and derived benefits therefrom.

36. As well, upon information and belief, Geraghty, Robson, Higgins, Rivera and other employees and agents of defendants, gained the benefit of favorable performance reviews as a result of their participation in the aforementioned infringing conduct.

37. The benefits received by defendants were to the detriment of plaintiffs.

38. As a result of the foregoing, defendants were unjustly enriched and accordingly, this Court in the exercise of its equitable powers should require defendants to make restitution to plaintiffs in an amount to be determined by the Court, but is believed to be in excess of $75,000.

## Fifth Cause of Action

## (Common law Negligence)

39. Plaintiffs repeat each allegation of paragraphs 1 through 38 as though fully set forth herein.

40. Defendants City and FDNY had a duty to supervise, regulate and govern their employees and agents when performing their public and quasi-public activities.

41. In the event that some of their employees and agents engaged in conduct that violate the statutory and common law rights of a member of the public, defendants City and FDNY had a duty to discipline such employees.

42. Defendants City and FDNY knew or had reason to know that some of their employees and agents violated the propriety rights of plaintiffs, yet they failed to take any appropriate or meaningful steps to discourage, investigate, intervene or discipline each and all of the individual defendants for the conduct complained of herein.

43. Upon information and belief, defendants City and FDNY knew or had reason to know that some or all of the individual defendants named herein used public facilities and/or public funds to create, manufacture and/or distribute defendants' unauthorized and infringing copies of plaintiffs' Training Device and failed to take steps to prevent improper use of such public facilities and/or funds.

44. Defendants City's and FDNY's failure constitutes negligence by which plaintiffs have been damaged.

**WHEREFORE**, plaintiffs demand judgment:

a. finding that the defendants has copied plaintiffs' patented innovations and products;

b. preliminarily and permanently enjoining and restraining each of the defendants, their agents, servants, employees, successors and assigns, and all those acting in concert or participation with it, from:

(i) manufacturing, producing, using and distributing products embodying the subject matter of the invention of the '493 Patent;

(ii) engaging in any other activity constituting an infringement of the '493 Patent;

(iii) assisting, aiding or abetting any other person or entity in engaging in or performing any of the activities referred to herein;

c. directing that the defendants, at their sole expense, recall Accused Devices that embody the inventions of the claims of the '493 Patent which were manufactured, distributed, sold or shipped by them and to reimburse their customers from whom said merchandise was recalled;

d. directing that the defendants deliver to plaintiffs' attorneys or representatives for destruction all products, molds, plates, dies and any other materials in their possession or under their control which embody the inventions of the claims of the '493 Patent;

e. directing that the defendants file with the Court and serve on plaintiffs' counsel a report in writing and under oath setting forth in detail the manner in which they have complied with any temporary restraining order, or preliminary or permanent injunction entered herein within thirty (30) days of receipt of service of any such order or injunction;

f. directing the defendants to account to plaintiffs for actual damages suffered by it, including its lost sales, as a result of the infringement and the active inducement of infringement of the '493 Patent, directing that such damages be trebled because of the willful and deliberate nature and character of the infringement, together with an assessment of interest, and awarding plaintiffs judgment in that amount against the defendants;

g. directing the defendants to account to plaintiffs for the defendants unjustly received profits resulting from infringement of the '493 Patent;

h. for an assessment of costs, interest and attorneys' fees incurred by plaintiffs; and

i. for such other and further relief as the Court deems just and proper.

Dated: New York, New York
January 15, 2007

John A. Dalley (JD2397)

521 Fifth Avenue, 28th Floor
New York, New York 10175
Phone: (212) 931-5500
Email: jdalley1@nyc.rr.com

Attorney for Plaintiffs

# EXHIBIT A

US005906493A

# United States Patent [19]

**Bishop**

[11] **Patent Number: 5,906,493**

[45] **Date of Patent: May 25, 1999**

[54] **FIREFIGHTER TRAINING DOOR DEVICE**

[76] Inventor: **Michael Bishop**, 64-19 65th St., Middle Village, N.Y. 11379

[21] Appl. No.: **09/001,932**

[22] Filed: **Dec. 31, 1997**

[51] **Int. Cl.**[6] .................... **G09B 19/00**

[52] **U.S. Cl.** .................... **434/226**; 292/357; 49/141; 49/394; 49/503; 70/465

[58] **Field of Search** .................... 434/226; 49/141, 49/503, 394; 70/465, 467; 292/341.16, 357; 414/684.3

[56] **References Cited**

U.S. PATENT DOCUMENTS



| | | | |
|---|---|---|---|
| 4,001,949 | 1/1977 | Francis | 35/10 |
| 5,203,707 | 4/1993 | Musto | 434/226 |
| 5,316,484 | 5/1994 | Layton | 434/226 |
| 5,562,314 | 10/1996 | Wheatland et al. | 292/1.5 |



*Primary Examiner*—Jessica J. Harrison
*Assistant Examiner*—David A. Fleming
*Attorney, Agent, or Firm*—Goldstein & Canino

[57] **ABSTRACT**

A training device, for mounting to a standard door having a cutout at middle height, the door mounted in a door frame having a strike plate at middle height. A sliding box is mounted in the cutout for slidable motion toward and away from the strike plate. At least one spring is mounted between the sliding box and the cutout for biasing the sliding box toward the strike plate. The spring is selected to resist compression and thus motion of the sliding box away from the strike plate. The amount of resistance that the spring provides is equivalent to the amount of resistance presented by a doorknob and locking assembly on standard doors. Thus, a crowbar-like tool may be used to pry the sliding box away from the strike plate to open the door and simulate the force and action necessary to pry open any standard door.

**6 Claims, 5 Drawing Sheets**









FIG.1




FIG.2




FIG.3


46
48
46
48
50
48
22
52
46
28
38
48
44
50
48
36
48
30
50
48
38
42
52
44
48
50
10
48
40
44

FIG.4




FIG.5




FIG.6

# FIREFIGHTER TRAINING DOOR DEVICE

## BACKGROUND OF THE INVENTION

The invention relates to a firefighter training device. More particularly, the invention relates to a device specifically designed to demonstrate to a firefighter the proper technique for prying open a typical locked door.

In order to most effectively fight a fire in a burning building, a firefighter needs access to various points around the fire. In addition, one of the primary tasks of a firefighter to ensure that no occupants remain trapped, injured, or unconscious in the building. However, often locked doors stand in the way of properly fighting the fire, or fully inspecting a building to ensure that no one has remained inside.

Various firefighter training regiments are time honored, and are necessary to ensure that a firefighter is best equipped to deal with any situation that may be encountered in the field. Thus, firefighter training not only involves the teaching of rescue skills, but also involves teaching practical skills well known by any veteran firefighter—such as how to gain access to an otherwise locked building structure. Gaining access to a locked building involves a variety of techniques, from breaking a window with an ax, to prying open a door with a crowbar-like tool known as a "Haligan tool".

Training a fledgling firefighter to use a "Haligan tool" generally involves practicing the act of prying open a locked open. However, very often the door is ruined by this attempt, especially when the students try for the first time. Thus, many doors are ruined during the training exercises.

Various devices are available to enhance other aspects of firefighter training. While these units may be suitable for the particular purpose employed, or for general use, they would not be as suitable for the purposes of the present invention as disclosed hereafter.

## SUMMARY OF THE INVENTION

It is an object of the invention to produce a training device which teaches a firefighter how to pry open a locked door. The invention installs into a standard door, replacing the lock mechanism, and simulates the response of the lock mechanism to a prying action. The invention includes a sliding assembly which slides a small distance laterally away from the strike plate when properly pryed.

It is another object of the invention to provide a training device which closely emulates the resistance presented by a lock mechanism of a standard door. The invention includes one or more springs that are positioned adjacent to the sliding assembly to resist lateral movement of the sliding assembly.

It is a further object of the invention that the resistance is adjustable to simulate different doors. The spring tension may be adjusted, and the springs may be replaced to provide suitable resistance.

The invention is a training device, for mounting to a standard door having a cutout at middle height, the door mounted in a door frame having a strike plate at middle height. A sliding box is mounted in the cutout for slidable motion toward and away from the strike plate. At least one spring is mounted between the sliding box and the cutout for biasing the sliding box toward the strike plate. The spring is selected to resist compression and thus motion of the sliding box away from the strike plate. The amount of resistance that the spring provides is equivalent to the amount of resistance presented by a doorknob and locking assembly on standard



doors. Thus, a crowbar-like tool may be used to pry the sliding box away from the strike plate to open the door and simulate the force and action necessary to pry open any standard door.

To the accomplishment of the above and related objects the invention may be embodied in the form illustrated in the accompanying drawings. Attention is called to the fact, however, that the drawings are illustrative only. Variations are contemplated as being part of the invention, limited only by the scope of the claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

In the drawings, like elements are depicted by like reference numerals. The drawings are briefly described as follows.

FIG. **1** is a front elevational view, illustrating a standard door.

FIG. **2** is a front elevational view, illustrating a door, wherein a cutout has been made, and holes have been drilled to allow installation of the invention.

FIG. **3** is an assembly drawing, illustrating the sliding box being mounted in the cutout, with a pair of springs installed between the sliding box and cutout.

FIG. **4** is an assembly drawing, illustrating the front and rear cover plates being installed over the door and sliding box, and being secured in place with bolts.

FIG. **5** is a diagrammatic perspective view, illustrating a tool being applied to the fully installed invention.

FIG. **6** is a front elevational view, wherein the tool has pryed the sliding box away from the strike plate.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIG. **1** illustrates a standard door **10** and door frame **12**. The door is mounted to the door frame **12** with hinges **14**. An inside edge **16** of the door **10** is opposite the hinges **14**. A lock and doorknob assembly **18** is located on the door **10** at middle height near the inside edge **16**, which is actually slightly below the middle of the door, but which more specifically refers to the height of the lock and doorknob assembly on any standard door. A strike plate **20** is mounted to the door frame **12** adjacent to the lock and doorknob assembly **18**, for cooperating with the lock and doorknob assembly **18** to latch and lock the door. To pry open a locked door of the type illustrated, a tool is inserted between the inside edge **16** and the strike plate **20** to provide enough clearance for the lock and doorknob assembly to unlatch from the strike plate **20**.

FIG. **2** illustrates the door **10**, which has been prepared for installation of the invention by providing a cutout **22** extending from the inside edge **16** toward the hinge **14**, for a distance known as a cutout depth. The cutout **22** is at middle height on the door. The cutout **22** has a cutout upper edge **24**, a cutout lower edge **26**, and a cutout back edge **28**.

Illustrated in FIG. **3**, a sliding box **30** is provided to fit within the cutout **22**. Also illustrated in FIG. **3**, a pair of springs **32** are mounted between the sliding box **30** and the cutout back edge **28**. The springs **32** are seated in spring mounting holes **34** that are present on both the cutout back edge **28** and the sliding box **30**. The springs **32** bias the sliding box **30** toward the inside edge **16** of the door **10**. The sliding box **30** features a mock door knob **36** and a mock latch **37** which is located on the sliding box **30** where the lock and doorknob assembly would be mounted on a standard door **10**. The sliding box **30** also has a pair of guide holes **38** which extend fully through the sliding box **30**.

Referring to FIG. **4**, a front plate **40** and a back plate **42** are mounted to opposite sides of the door **10** over the cutout **22**, sandwiching the sliding box **30** in the cutout **22**. The front plate **40** and back plate **42** are mounted to the door **10** with a plurality of mounting bolts **44**, which are fastened with mounting nuts **46**. The mounting bolts **44** extend through mounting holes **48** which are present in a matching pattern on both the front plate **40** and back plate **42**. The mounting holes **48** are also present on the door **10** to match the pattern on the front plate **40** and back plate **42**. However, as illustrated, one or more of the mounting bolts **44** can extend directly between the front plate **40** and back plate **42**, by extending between the cutout back edge **28** and the sliding box **30**.

The front plate **40** and back plate **42** each have a pair of guide slots **50**, and a knob indent **52** for accommodating the mock door knob **36** and avoiding interference between the mock door knob **36** and the front plate **40** and back plate **42** which might limit motion of the sliding box **30**. The guide holes on the sliding box **30** correspond with the guide slots **50** when the front plate **40** and back plate **42** are mounted to the door **10**.

Referring to FIG. **5**, the front plate **40** and back plate **42** have been installed onto the door **10** with the mounting bolts **44**. Guide bolts **54** have been inserted through the guide slots **50** and through the guide holes **38** in the sliding box **30**. The guide slots **50** limit the lateral travel of the sliding box **30** toward and away from the strike plate. The sliding box **30** is exerting a force against the strike plate **20** under a decompressive force exerted by the springs, engaging the mock latch **37** with the strike plate.

Illustrated in FIG. **5**, a "haligan" tool or crowbar **60** is being inserted between the sliding box **30** and strike plate. The application of said tool in FIG. **5** and FIG. **6** is shown not for purposes of illustrating proper use of said tool, but for purpose of demonstrating operation of the invention.

In FIG. **6**, the crowbar **60** has been used to pry the sliding box **30** from the strike plate **20**. The springs have been compressed, and have exerted resistance to said compression which mimics the resistance offered by the locking assembly on a standard door. With the force exerted by the sliding box against the strike plate relieved, and the mock latch **37** cleared of the strike plate, the door may be urged open with the crowbar **60**.

It should be further noted that the springs may be interchanged to simulate different doors and locking mechanisms. Since different locking mechanisms require different amounts of force before they are overcome, varying the springs makes the exercise more challenging to the trainee. Such varyance also trains the fledgling firefighter to get a feel for the proper amount of force necessary under a given set of circumstances.

In conclusion, herein is presented a training device which allows for proper demonstration of the techniques necessary



for prying open a locked door. The device includes a sliding box assembly which offers resistance to opening, but which can be overcome in a similar manner and with similar force that a conventional door can be pryed open. The sliding box is not damaged when pryed open, thus the training device can be used over and over.

What is claimed is:

1. A training device, for training the technique of opening a conventional locked door which has a lock and doorknob assembly, comprising:

a standard door having an inner edge and a cutout at middle height extending into the standard door from the inner edge;

a door frame having a strike plate at middle height;

a sliding box slidably mounted within the cutout adjacent the strike plate for slidable motion toward and away from the strike plate, the sliding box having a mock door latch which selectively engages the strike plate as the sliding box moves toward the strike plate;

a spring means between the sliding box and the cutout, biasing the sliding box against the strike plate such that the sliding box may be pryed away from the strike plate using similar force as would be required to pry the lock and doorknob assembly of the conventional locked door from the strike plate to open said door.

2. The training device as recited in claim **1**, further comprising a front plate and back plate which mount to the door, sandwiching the sliding box therebetween.

3. The training device as recited in claim **2**, wherein:

the front plate and back plate further each comprise at least one guide slot;

the sliding box comprises at least one guide hole which corresponds with the guide slots when the front plate and back plate are mounted to the standard door; and

a guide bolt extends through the guide slots and through the guide hole such that the guide slot limits the lateral motion of the sliding box by interfering with lateral motion of the guide bolt beyond the guide slot.

4. The training device as recited in claim **3**, wherein the cutout has a back edge, wherein the cutout back edge and the sliding box both have spring mounting holes; and wherein the spring means further comprises a pair of springs which are seated in the spring mounting holes to bias the sliding box toward the inner edge of the door.

5. The training device as recited in claim **4**, wherein the sliding box further comprises a mock door knob.

6. The training device as recited in claim **5**, wherein at least one of the front plate and back plate have a knob indent for accommodating the mock knob and preventing interference between the mock knob and the front plate and back plate which might limit motion of the sliding box.

* * * * *